**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **VINCENT GUNTER** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | **NO. 14-2925** |
| | : | |
| **CAMBRIDGE-LEE** | : | |
| **INDUSTRIES, LLC,** | : | |
| **Defendant** | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                                    **May 11, 2016**

Vincent Gunter filed an action against Cambridge-Lee Industries ("CLI"), his former employer, asserting claims of interference, retaliation, and discrimination under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.* Specifically, Mr. Gunter claims that the defendant interfered with his FMLA rights by disciplining him, and later terminating him, for being absent on days that should have been deemed FMLA-protected. CLI filed a motion for summary judgment. For the following reasons, I will grant the motion in part and deny it in part.

**I. BACKGROUND**

Located in Reading, Pennsylvania, CLI is a manufacturer and distributer of copper tubing necessary for a variety of commercial applications. See Document #21-2, Exhibit A at ¶ 2. In June 2006, CLI hired Mr. Gunter as a millwright at Plant 4 of its Reading facility. See Document #21-2, Exhibit B at 9. A collective bargaining agreement negotiated between CLI and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the

"contract") governed Mr. Gunter's employment relationship with CLI.[1]  See Document #21, Exhibit B at 10; Exhibit C at 6.

### A.     The Union Contract and CLI's FMLA Policy Update

Mr. Gunter, in his role as a Shop Steward and member of the Union's grievance committee, was familiar with the contract, and was aware of CLI's FMLA policies and procedures.  See Document #21-2, Exhibit B at 10-11, 13-15.  The contract contained a section on the FMLA and CLI's Absentee Control Policy.  See Document #21-4, Exhibit C at 62-64, 84-89.  The contract's Absentee Control Policy assigned points to different categories of absences and tardiness.  Id. at 86-88.  The point calculations are as follows:

Absence..............................................................................1 Point
Absence, no report off......................................................3 Points
Late .................................................................................. 0.5 Point
Leave Early ...................................................................... 0.5 Point
Late report off (less than .5 hours prior to start of shift)..1.5 Points
Late report off after start of scheduled shift.......................2 Points
Late report off – four (4) hours after start of shift ............3 Points
Absence the day before and/or after a holiday ..................1 Point

Id. at 86.  Points are not assessed to employees who take FMLA-protected absences.  Id. at 63-64.  I note that if an employee has "perfect attendance" for a calendar month, one point is deducted from his or her total.  See Document #26-1 at 8; see also Document #21-2 at 86; Document #21-4 at 87.  If the employee enjoys perfect attendance for an entire calendar year, his or her total number of points is reduced to zero.  Id.

The contract also requires an employee who believes he has received an inaccurate

---

[1] In the plaintiff's denial of the defendant's concise statement of undisputed facts, the plaintiff treats any mention of specific provisions of the union contract as "denied as a conclusion of law and not fact."  See Document #26 at 2.  Thus, I will refer to the contract as I refer to the rest of the record, and will not interpret the contract or resolve any questions of law pertaining to it.

point total to grieve the matter.  See Document #21-3, Exhibit C at 13.  The first step in the grievance procedure is for an employee to raise the matter with a shop steward, who must then investigate the matter and submit a written Grievance Fact Finding Form to the employee's foreperson.  Id. at 14.  After the aggrieved employee's foreperson makes a determination, the employee may appeal that decision by filling out a grievance form within ten working days of the date of the foreperson's answer.  Id. at 13-14.  Ultimately, if an employee fails to grieve a disciplinary action, the contract prevents an employee's later contest of that discipline.  Id. at 16.

In October 2012, CLI updated its FMLA policy.  See Document #21, Exhibit B at 11; Document #21-5, Exhibit E.  CLI's FMLA Policy Update requires employees who need to take FMLA leave to "contact Joan Lacki in Human Resources.  Leave requests must be made at least 30 days in advance for 'Foreseeable' absences, and as soon as practicable for emergency absences."  See Document #21-5, Exhibit E.  The Policy also contains a section detailing additional steps an employee needs to take to report an FMLA absence.  Id.  The Policy states that to report an FMLA-protected absence, employees must (1) "[c]all in to Cambridge-Lee to report the absence as per normal call off procedures;" and (2) "[c]all in to the FMLA Administrator to report the absence and verify the details of the absence."  Id.  The updated Policy warned employees that "[f]ailure to follow these requirements could delay your FMLA request and proper designation of an absence for payroll."  Id.

3

**B.      Mr. Gunter Accumulates Points Under
        the Contract's Absentee Control Policy**

On September 30, 2012, Mr. Gunter received a written warning for accumulating six points under CLI's Absentee Control Policy.  See Document #21, Exhibit B at 19; Exhibit G.  Mr. Gunter did not grieve those points.  See Document #21-2, Exhibit B at 21-22.  On November 20, 2012, Mr. Gunter received a second written warning for accumulating three additional points.  Id. at 22, Exhibit H.  Mr. Gunter did not grieve this second warning.  Id. at 22.  On March 31, 2013, Mr. Gunter received a written warning entitled, "THREE DAY SUSPENSION," because he had accumulated twelve points.[2] See Document #21-2, Exhibit B at 22-23.  Mr. Gunter does not remember whether he grieved his March point total or the resulting suspension notice.  Id. at 24.  Because Mr. Gunter had perfect attendance for the months of February and April 2013, two points were deducted from his total, in keeping with the Policy.  Id.

**C.      Mr. Gunter Suffers Exacerbation of Asthma**

On May 5, 2013, Mr. Gunter reported to his 10 p.m. shift, but left work to go to St. Joseph's Medical Center at 3:30 a.m., on May 6, 2013, because he experienced difficulty breathing.  See Document #21, Exhibit B at 24, 25, 28-29; Exhibit J.  Mr. Gunter was released from the hospital later that day.  See Document #21-2, Exhibit B at 36-37. Records from Mr. Gunter's hospital visit show that he was diagnosed with an exacerbation of asthma but was deemed able to return to work on May 7, 2013.  See Document #21-5, Exhibit J.  The treatment provider at St. Joseph's restricted Mr. Gunter

---

[2] Although Mr. Gunter received this written warning, CLI never scheduled his suspension.

4

to work "light duty, 2 days, then return to normal activity."  Id.  Mr. Gunter did not return to work on May 7, 2013.  He called out using the normal CLI call-off procedure, and received one point for his absence.  See Document #21-2, Exhibit B at 58-59; see also Document #21-6, Exhibit K.

On the morning of May 9, 2013, Mr. Gunter saw his physician, Dr. Nguyen, who gave him a note stating: "pt excused from work due to asthma until released by Dr. Nguyen."  See Document #21-2, Exhibit B at 37-38, 40, 43; Exhibit L at 9.  That evening, Mr. Gunter returned to work, and presented his supervisor, Dennis Zulick, with the medical records from St. Joseph's Hospital that authorized him to work "light duty."  See Document #21-2, Exhibit B at 61.  Mr. Gunter stated that Mr. Zulick sent him home early from his shift that evening because there was no light duty work available.  Id. at 60-61.  CLI added a half point to Mr. Gunter's point tally due to his early departure from work May 9, 2013.  Id. at 60.  Mr. Gunter did not work from May 10 through 23, 2013 and was assessed one point by CLI for this stretch of absences.  Id. at 60-62.

### D.    Mr. Gunter Requests FMLA Certification Paperwork from CLI

Mr. Gunter indicates that, after seeing Dr. Nguyen on May 9, 2013, he contacted Steven Letcavage, CLI's Human Resources Director, and requested that FMLA paperwork be faxed to Dr. Nguyen's office.  See Document #26-1, Exhibit A at ¶ 5.  On May 14, 2013, Joan Lacki asked Mr. Letcavage if she should send short term disability and FMLA paperwork to Mr. Gunter in response to a "garbled" voice message Mr. Gunter had left on Mr. Letcavage's voicemail.  See Document #28-3, Exhibit I at 11-14; Document #28-4, Exhibit J at 23-25.  Mr. Letcavage did not direct Ms. Lacki to send the

FMLA paperwork at that time, and it was not sent to Mr. Gunter that day.  See Document #28-3, Exhibit I at 13.

On May 22, 2013, Mr. Gunter left Mr. Letcavage another voicemail requesting that CLI fax the necessary FMLA paperwork to Dr. Nguyen.  In that voicemail, Mr. Gunter provided a fax number for Dr. Nguyen's office.  See Document #28-4, Exhibit J at 6-7.  After receiving the voice message, Mr. Letcavage directed Ms. Lacki to fax the paperwork to Mr. Gunter's physician.  See Document 21-2, Exhibit A at ¶ 6.  The next morning, May 23, 2013, Ms. Lacki attempted to fax the FMLA paperwork, but was unable to do so because the fax number provided by Mr. Gunter "didn't work."  See Document #28-3, Exhibit I at 17-18, 30-31; Document #28-4, Exhibit J at 11-12.  Ms. Lacki stated that because the fax number was incorrect, she decided to mail the FMLA certification forms directly to Mr. Gunter on May 23, 2013.  See Document #28-3, Exhibit I at 20-21.

Mr. Gunter adamantly denies receiving the FMLA and short term disability paperwork from CLI that was purportedly sent on May 23, 2013.  See Document #28-1, Exhibit H at 108.  The letter that Ms. Lacki allegedly sent to Mr. Gunter was not sent by certified mail, did not include Mr. Gunter's zip code, did not refer explicitly to FMLA paperwork, and did not set a deadline to return such paperwork.  See Document #27-4 Exhibit F; Document #28-3, Exhibit I at 24, 26.  Mr. Gunter attended follow-up appointments at Dr. Nguyen's office on both May 16 and May 23, 2013.  See Document #26-1, Exhibit A at ¶¶ 9-10.  Dr. Nguyen released Mr. Gunter to return to work on May 23, 2013, but was of the opinion that "[Mr. Gunter] would require intermittent leave from

6

work in the future if his condition became exacerbated again." See Document #26-2, Exhibit B at ¶ 10.

### E.     Mr. Gunter Continues to Accumulate Points in June 2013

On May 31, 2013, Mr. Gunter received a fourth written warning entitled, "3 DAY SUSPENSION," for accumulating 13.5 points. See Document #21-6, Exhibit M. This notice of suspension stated that Mr. Gunter would be terminated if he incurred another one and a half points. Id. Mr. Gunter returned to work on May 24, 2013, and from that date until June 10, 2013, did not incur any points for infractions of the Absentee Control Policy. See Document #21-2, Exhibit B at 63.

On June 11, 2013, Mr. Gunter was late for work and did not call CLI to inform anyone of his impending tardiness.[3] Id. Mr. Gunter was absent on June 14 and 15, 2013. Id. He called off in accordance with CLI's normal call-off procedure, but did not contact the FMLA Administrator. Id. at 64-65. Mr. Gunter requested FMLA leave for June 14 and 15, but received two points from CLI for these absences. Id. at 63-64, 111. CLI's third party FMLA Administrator Murray Securus considered approving FMLA leave for those days but never received the necessary recertification paperwork from Mr. Gunter. See Document #28-3, Exhibit I at 34-38.

From June 16 to June 24, 2013, Mr. Gunter worked without incident. See Document #21-2, Exhibit B at 64. However, on June 25, 2013, Mr. Gunter was late and received half a point pursuant to the Absentee Control Policy. Id. at 65. The next day,

---

[3] I note that although Mr. Gunter received only one point for this lateness, it appears he could have received 1.5 points for failure to call in to inform the defendant in advance of the lateness, in keeping with the defendant's Policy.

June 26, Mr. Gunter called off late, that is, he called off less than thirty minutes before the start of his scheduled shift, and received one and a half points under the Policy.  Id. The following day, June 27, 2013, Mr. Gunter was absent from work, calling out using only CLI's call out procedure, and received one point for this absence.  Id. at 66.  On June 29, 2013, Mr. Gunter incurred an additional half point for tardiness.  Id.

Mr. Gunter's Attendance Record reflected that by June 30, 2013, he had accumulated 19.5 points under the Absentee Control Policy.  Included in CLI's point calculation were 8.5 points assessed due to Mr. Gunter's absences and tardiness in May and June 2013.  See Document #21-6, Exhibit K.  CLI's Absentee Control Policy indicates that a fifteen point accumulation results in termination.  As a result of his points, Ms. Lacki called Mr. Gunter on July 5, 2013, and informed him not to report to work because he was suspended pending termination.  See Document #21-2, Exhibit B at 68-69.  Mr. Gunter then requested and received his attendance records from CLI and called Union personnel to begin the grievance process.  Id. at 69-71.  Mr. Gunter received a letter from Mr. Letcavage informing him that he was suspended for accumulating too many points under the Absentee Control Policy.  Id. at 67-68; see also Document #21-6 at 17.

### F.    The Third Step Meeting

Pursuant to the contract, CLI, the Union, and Mr. Gunter attended a "third step" meeting on July 19, 2013.  Id. at 72-73.  There, Mr. Gunter presented evidence that intended to show that CLI had miscalculated his point total, and by extension, that he should keep his job.  Id.  Mr. Gunter explained that neither he nor Dr. Nguyen had

received FMLA paperwork from CLI despite his repeated requests.  <u>See</u> Document #26-1, Exhibit A at ¶ 24-25.  At that meeting, Mr. Gunter presented his own written calculation of his points total.  <u>See</u> Document #21-6 at 13.  The calculation showed that Mr. Gunter should have received no points during the months of May and June 2013, because those occurrences were all FMLA-protected.  <u>Id.</u>  At his deposition, Mr. Gunter testified that not only should he not have been assessed points in May 2013, but he should have lost one point for having accrued zero points that month, in keeping with the Policy.  <u>See</u> Document #21-2 at 85-86, 106-107.  Similarly, Mr. Gunter testified that the points assessed against him in June 2013 were improper because the occurrences were also FMLA-protected.  <u>Id.</u> at 89.

When asked why he chose to not grieve the written warnings he had received, Mr. Gunter responded that

> "federal law trumped our contract, which once you involve the FMLA in this, this is a higher standard, it trumps the language of the contract.  So, I was not concerned with the grievance process.  I was concerned with the violations that dealt with federal law."

<u>Id.</u> at 93-94.

CLI formally terminated Mr. Gunter on July 24, 2013.  <u>See</u> Document #21-6, Exhibit O.  Mr. Gunter sought the assistance of the Union in an effort to be reinstated. As part of that process, Union Staff Representative Steven Gombos received documents from Mr. Letcavage which showed that (1) Mr. Gunter had not followed CLI's FMLA call-out procedure; (2) he had not grieved the points he had accumulated under the contract's Absentee Control Policy; and (3) he had been sent FMLA certification

paperwork by Ms. Lacki.  See Document #21-6, Exhibit P.  After consideration of this

evidence, the Union withdrew Mr. Gunter's case from the grievance procedure.  In a

letter dated September 16, 2013, Mr. Gombos informed Mr. Letcavage:

> While it is clear there is substantial argument from both sides over the FMLA issue, it appears the discharge is just based purely on a points issue, without looking at the 4 instances totaling 4.5 points being claimed as FMLA in June on Mr. Gunter's submission in the third step.
>
> The attendance calendar shows 13.5 points at the end of May along with the acknowledgement of this signed by Mr. Gunter.  Said 13.5 points were not grieved by Gunter for the whole month of June.  The attendance calendar shows three (3) instances of lateness (June 11, June 25, and June 29).  These "lates" total 1.5 points and when added to the previous un-grieved point total of 13.5 takes the point total to 15 points, grounds for discharge.

See Document #21-6, Exhibit Q.  On September 20, 2013, Mr. Gombos provided the

following explanation of Mr. Gunter's case to John P. DeFazio, the Union's District

Director:

> Mr. Gunter signed a warning notice that he received on May 31, 2013 stating that he was at 13.5 points, which he did not grieve in the 10 day period.  Therefore, he was at 13.5 points at the start of June.  Subsequently, he was late three times in June, where he received .5 of a point for each instance.  Therefore, he was at 15 points under the system.  As he states, he is/was a griever and therefore, has been in many grievance meetings over the points system.  He knows how it works.
>
> It is true he was hurt in May and missed time, but if those absences were over the same thing he now claims as FMLA, he did not challenge them within 10 days of becoming aware of receiving points.  While he has repeatedly pushed an issue of FMLA, his own handwritten statement to the Union and Company in the

> third step points out only the June absences as related to the FMLA, but not the 1.5 points for lateness.  I do not believe FMLA enters into the picture as it does not matter in June, and if it did matter, he did not grieve the May point total.   Additionally, he had never filled out his portion of the FMLA application form.   He was in the plant 23 work days in May and June, where all he had to do was get in touch with the HR department and pick up the form, fill out his version, and get it to his doctor.

See Document #21-6, Exhibit R.  After reading the Union's correspondence to Mr. Letcavage at his deposition, Mr. Gunter testified that apparently he had received FMLA credit for four occurrences in June 2013, which ultimately brought his total from 19.5 points to 15.0 points.  He further testified, however, that the occurrences in May 2013 were for the same injury as in June 2013, and should also have been FMLA-protected. He insisted that even if he were given FMLA credit for a half point of the 2.5 points assessed in May, his total points at the third step meeting would have been below the 15.0 points needed for termination.  See Document #21-2 at 111-112.

### G.   CLI Sends FMLA Paperwork to Mr. Gunter on July 19, 2013

On July 19, 2013, the date of the third step meeting, Ms. Lacki mailed FMLA paperwork to Mr. Gunter, this time by certified mail and with Mr. Gunter's correct zip code.  See Document #28-3, Exhibit I at 40-41.  The letter requested that Mr. Gunter deliver the FMLA paperwork directly to CLI by July 29, 2013.  Id. at 43.  Mr. Gunter then provided the paperwork to Dr. Nguyen.  See Document #28-1, Exhibit H at 77-78. Dr. Nguyen properly filled out and returned the forms by fax to CLI on July 29, 2013. See Document #28-4, Exhibit J at 13, 40-41.  Ms. Lacki, however, did not forward the forms to CLI's third party FMLA Administrator because CLI had terminated Mr. Gunter

11

on July 24, 2013.  <u>See</u> Document #28-3, Exhibit I at 44.

The FMLA paperwork ultimately submitted by Mr. Gunter and Dr. Nguyen requested continuous leave lasting "a few days to a week," a reduced work schedule, and intermittent leave of two times a month for chronic allergies and asthma.  <u>See</u> Document #26-2, Exhibit B at 25-26.  The request was for a lifetime condition, which began on March 8, 2013.  <u>Id.</u> at 22.  The request also covered the time period from May 9, 2013 through at least July 29, 2013.  <u>Id.</u> at 25.  This completed paperwork apparently contained all documentation necessary to apply for FMLA leave according to Ms. Lacki who stated that "[t]he FMLA documents were complete" although Mr. Gunter had already been terminated by the time Ms. Lacki received those documents.  <u>See</u> Document #28-3, Exhibit I at 58.

## II.  STANDARD OF REVIEW

A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  <u>Id.</u>

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  Where the non-moving party bears

the burden of proof on a particular issue at trial, the movant's initial <u>Celotex</u> burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." <u>Id.</u> at 325.  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials.  FED. R. CIV. P. 56(c)(1)(A).  That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 322. Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the opposing party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 255. The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. <u>Id.</u> at 252.  If the non-moving party has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. <u>Big Apple BMW, Inc. v. BMW of North America, Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.  DISCUSSION

Mr. Gunter asserts claims of FMLA interference, FMLA discrimination, and FMLA retaliation in his complaint.  <u>See</u> Document #1, Compl. ¶¶ 22-28.  Mr. Gunter

alleges that CLI interfered with his FMLA rights by disciplining him, and later terminating him, for being absent on days that should have been deemed FMLA-protected by CLI.  The FMLA was passed in recognition of the need to "balance the demands of the workplace with the needs of families."  29 U.S.C. § 2601(b)(1).  The FMLA allows eligible employees to take protected "reasonable leave" for serious medical conditions and other family reasons.  See 29 U.S.C. § 2601.  However, leave must be taken "in a manner that accommodates the legitimate interests of employers."  29 U.S.C. § 2601(b)(3).

The FMLA requires employers with fifty or more employees to provide up to twelve weeks of unpaid, job-protected leave to an "eligible employee"[4] who needs time off from work due to a "serious health condition that makes the employee unable to perform" the employee's job.  See 29 U.S.C. § 2612.  A "serious health condition" is defined as a medical condition that requires inpatient care or "continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  Employers may request that employees seeking FMLA-protected leave return a certification completed by a treating health care provider describing the employee's diagnosis, anticipated length of leave, and how the serious health condition prevents an employee from performing his or her job.  See 29 U.S.C. § 2613.

The Act's implementing regulations make clear that employees seeking leave for emergent or unforeseeable injuries or conditions request leave as soon as practicable.

---

[4] An eligible employee is one who (1) has been employed by the employer for at least one year, and (2) has worked at least 1250 hours in the year preceding the employee's need for leave.  See 29 U.S.C. § 2611(2)(A).

<u>See</u> 29 C.F.R. § 825.303(a).  Additionally, employees must comply with the employer's practices and procedures for requesting leave.  Such compliance can include calling a special telephone number or notifying a specific person to request FMLA-protected leave.  <u>See</u> 29 C.F.R. §§ 825.302(d); 825.303(c).  If an employee does not comply with an employer's typical procedural requirements and no unusual circumstances justify such a failure to comply, "FMLA-protected leave may be delayed or denied."  <u>Id.</u> § 825.303(c).  The regulations also state that, in most cases, the employer should request a certification within five business days of receiving notice of an employee's potential FMLA-protected leave.  29 C.F.R. § 825.305(b).  The employee must then provide the employer with the requested certification within fifteen calendar days.  <u>Id.</u>

It is also important to note that the FMLA sets the minimum requirements which employers must follow.  The FMLA states, "[n]othing in this Act or any amendment made to this Act shall be construed to diminish the obligation of an employer to comply with any collective bargaining agreement or any employment benefit program or plan that provides *greater* family or medical leave rights to employees than the rights established under this Act or any amendment made to this Act."  <u>See</u> 29 U.S.C. § 2652 (emphasis added).  Therefore, if a collective bargaining agreement provides for less protection than the FMLA, the FMLA controls.  <u>Id.</u>; <u>see also</u> <u>Callison v. City of Philadelphia</u>, 430 F.3d 117, 121 (3d Cir. 2005) ("Internal sick leave policies or any collective bargaining agreements are only invalidated to the extent they diminish the rights created by the FMLA").

15

**A.  Mr. Gunter's FMLA Interference Claim**

The FMLA makes it unlawful for "any employer to interfere with, restrain, or deny the exercise or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).  To prevail on an FMLA interference claim, Mr. Gunter must show that (1) he was an eligible employee, (2) the employer was required to provide FMLA benefits, (3) the employee was "entitled" to FMLA leave, (4) the employee notified the employer of his need to take FMLA leave, and (5) the employer denied the employee benefits he was entitled to pursuant to the FMLA.  See Ross v. Gilhuly, 755 F.3d 185, 191-92 (3d Cir. 2014) (quoting Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301 (3d Cir. 2012)).[5]  Once a plaintiff establishes a *prima facie* case of FMLA interference, a defendant may defeat the plaintiff's claim by showing that the plaintiff was terminated for reasons "unrelated to his exercise of rights."  See Lichtenstein, 691 F.3d at 312.

CLI does not dispute that Mr. Gunter was an eligible employee under the FMLA or that it was an employer obligated to provide FMLA benefits.  As such, prongs one and two of the Ross test have been satisfied.  Next, I will assess whether Mr. Gunter was "entitled" to FMLA leave under the third Ross prong.

      1.  Mr. Gunter was "entitled" to FMLA leave

To show that he was "entitled" to FMLA leave, Mr. Gunter must produce

---

[5] A condensed version of this test can be found in Budhun v. Reading Hospital and Med. Ctr., 765 F.3d 245 (3d Cir. 2014), which held that to assert an FMLA interference claim, a plaintiff need only show that: "(1) plaintiff was entitled to benefits under the FMLA, and (2) plaintiff was denied those benefits."  Id. at 252.

admissible evidence that he had a serious medical condition that made him unable to perform his job on the days for which he is seeking FMLA protection.  29 C.F.R. § 825.112(a)(4).  The FMLA defines "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a healthcare provider."  See 29 U.S.C. § 2611(11).  An implementing regulation defines "continuing treatment by a health care provider" as "[a] period of incapacity . . . of more than three consecutive calendar days . . . that also involves . . . [t]reatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider."  29 C.F.R. § 825.114(a).  Incapacity means the "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom."  Id.

Mr. Gunter asserts that from May 9-23, 2013, he was incapacitated due to an exacerbation of chronic asthma. See Document #28-1, Exhibit H at 112-113; Document # 26-2, Exhibit B at 6-10.  During this time, Mr. Gunter saw Dr. Nguyen a total of three times, and she placed Gunter on a plan of "continuing treatment."  See Document # 26-2, Exhibit B at 6-9.  The evidence from Dr. Nguyen shows that Mr. Gunter suffered from a serious health condition as defined by the FMLA.

Mr. Gunter also claims to have needed FMLA-protected intermittent leave on June 14-15, 2013 and June 26-27, 2013, due to exacerbation of chronic asthma.  See Document #28-1, Exhibit H at 63-64, 88.  Regarding intermittent leave, the FMLA suggests that "chronic serious health conditions" be considered in addition to "serious health conditions."  The implementing regulations provide that "[i]ntermittent leave may

be taken for absences where the employee . . . is incapacitated or unable to perform the essential functions of the position because of a chronic health condition . . ." 29 C.F.R. § 825.202(b)(2). A chronic serious health condition is one which "(i) requires periodic visits (defined as at least twice a year) for treatment by a health care provider . . . (ii) continues over an extended period of time (including recurring episodes of a single underlying condition); and (iii) may cause episodic rather than a continuing period of incapacity (e.g., *asthma*, diabetes, epilepsy, etc.)" See 29 C.F.R. § 825.102 (emphasis added). When Mr. Gunter submitted his certification, completed by Dr. Nguyen, on July 29, 2013, he requested intermittent leave for a time period covering all of June 2013. See Document # 26-2, Exhibit B ¶¶ 13-15.

There is sufficient evidence to show that Mr. Gunter suffered exacerbations of asthma throughout the month of June 2013. Dr. Nguyen stated in June 2013 that "Mr. Gunter was having ongoing respiratory problems related to his asthma, which affected his ability to work on an intermittent basis." Id. ¶ 11. Dr. Nguyen also examined Mr. Gunter on June 13, 2013, finding that "he was still having significant ongoing problems with his asthma and allergies." Id. ¶ 12. Therefore, I find that Mr. Gunter has satisfied the third prong of the Ross test by showing that he suffered from a "chronic health condition," i.e., asthma, a condition that the FMLA's implementing regulations specifically list in § 825.102.

### 2. Mr. Gunter notified CLI of his need to take FMLA leave

Under prong four of the Ross test, Mr. Gunter must show that he "notified" CLI of his need to take FMLA leave. Employees seeking leave for unforeseeable injuries

must request leave "as soon as practicable under the facts and circumstances of the particular case." See 29 C.F.R. § 825.303(a). Additionally, an employee must follow the employer's "notice and procedural requirements" when seeking leave that is not foreseeable. Id. § 825.303(c). To demonstrate compliance with the notice requirement of the Ross test, an employee must follow the employer's "notice and procedural requirements." See 29 C.F.R. § 825.303(c); see also Webster v. Milwaukee County, 731 F. Supp. 2d 837, 847 (E.D. Wis. 2010) (employer did not violate FMLA when plaintiff was fired for failing to follow employer's call off procedures).

An employee giving notice of the need to take FMLA leave "does not need to expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice . . ." though the employee must still satisfy the notice requirements set forth in § 825.303. See 29 C.F.R. § 825.301(a); see also Lichtenstein, 691 F.3d at 303 (collecting cases which state that the notice requirement of the FMLA is to be "liberally construed" and is not an onerous one). Once an employee gives notice, "in most cases, the employer should request that an employee furnish certification . . . in the case of unforeseen leave, within five business days after the leave commences." See 29 C.F.R. § 825.305(b). And, when an employer possesses enough information to "determine whether the leave is being taken for an FMLA–qualifying reason (e.g., after receiving a certification), the employer must notify the employee whether the leave will be designated and will be counted as FMLA leave within five business days absent extenuating circumstances." See 29 C.F.R. § 825.300(d)(1).

Here, Mr. Gunter contends that he reported his need to take FMLA leave for the

19

dates of May 9 through May 23, 2013, by requesting FMLA paperwork from Mr.

Letcavage as early as May 9, 2013, a request which went unanswered.  See Document

#28-1, Exhibit H at 105-108.  Furthermore, it is undisputed that Mr. Letcavage received

Mr. Gunter's request for FMLA paperwork on May 22, 2013.  Thus, Mr. Gunter was in

compliance with the first step of CLI's FMLA policy, and fulfilled his duty as an

employee in accordance with his employer's notice and procedural requirements under §

825.303(c).  See Document #21-5, Exhibit E.  Contacting Mr. Letcavage, Ms. Lacki's

superior, was considered by CLI as having the same significance as notifying Ms. Lacki

directly.  See Document #28-3, Exhibit I.

Mr. Gunter also contends that he called and requested FMLA paperwork a third

time from Mr. Letcavage following a visit with Dr. Nguyen on June 13, 2013.  See

Document #26-1, Exhibit A ¶ 16.  Mr. Gunter assumed his absences would be covered

by FMLA for June 14-15 and June 26-27, 2013, because he called the guard on duty at

CLI to report his absences as FMLA related.

The next step of CLI's FMLA policy states that "Completed Applications must be

completed in the Human Resources office and will be sent to HRS, who will send the

appropriate Certification of Healthcare provider for completion by the physician.  All

certificates are to be returned to HRS."  See Document #21-5, Exhibit E.  At this step, it

is unclear whether CLI followed its own FMLA procedures.  Instead of asking Mr.

Gunter to complete an "FMLA application" in the human resources office as the policy

states, Mr. Letcavage directed Ms. Lacki to fax FMLA paperwork to Dr. Nguyen.  When

that failed, Ms. Lacki attempted to mail Mr. Gunter paperwork which contained both

20

"FMLA paperwork and the short-term disability paperwork."  See Document #28-3 at 21, 11.  It appears that CLI bypassed: (1) its own "FMLA Application" phase when it mailed FMLA certification forms directly to Mr. Gunter; and (2) its requirement that HRS, its FMLA Administrator, handle the certification.  See Document #21-5, Exhibit E.

It is undisputed that Mr. Gunter requested FMLA leave on May 22, 2013, when he requested that Mr. Letcavage fax FMLA paperwork to Dr. Nguyen.  CLI contends that it mailed FMLA paperwork to Mr. Gunter's home on May 23, 2013.  Mr. Gunter adamantly denies receiving the required paperwork.  It is similarly undisputed that the letter and forms sent by Ms. Lacki on May 23, 2013 omitted Mr. Gunter's zip code, did not reference FMLA forms directly, and were not sent by certified mail.  See Document #28-3, Exhibit I at Lacki-5.  The described deficiencies with CLI's May 23 letter coupled with Mr. Gunter's denial that he received the May 23rd forms creates a disputed material fact in this case.  Had Dr. Nguyen received and completed the May 23rd FMLA certification forms in a timely manner, perhaps sometime in late May or early June 2013, Mr. Gunter might not have been assessed points for absences in May and June 2013.

Mr. Gunter notified CLI of his need for unforeseen FMLA protected leave in accordance with Section 825.301(a) and Section 825.303(c) of the implementing regulations.  The regulations next prompt the employer to seek a healthcare certification, and after scrutinizing it, the employer "must notify the employee whether the leave will be designated and will be counted as FMLA."  See 29 C.F.R. § 825.300(d)(1).  Here, the procedure envisioned by the FMLA's implementing regulations collapsed, and CLI appeared to not follow its own FMLA policy.

21

Lastly, it is undisputed that CLI sent the required forms to Dr. Nguyen on July 19, 2013, the date of the third step meeting.  See Document #28-3, Exhibit I at 40-41.  This time, CLI sent the forms by certified mail and included Mr. Gunter's correct zip code. Id. at 40-41.  Mr. Gunter provided the paperwork to Dr. Nguyen which she properly completed and returned by fax to CLI on July 29, 2013.  See Document #28-4, Exhibit J at 13, 40-41.

### 3.  Genuine Issue of Material Fact precludes Summary Judgment

CLI penalized Mr. Gunter for absences taken on May 9-23, 2013, June 14-15, 2013, and June 26-27, 2013, by assessing a total of six points against him for those missed days.  Had those six points been deemed FMLA-protected, Mr. Gunter would only have amassed a total of 13.5 points—below CLI's fifteen point termination threshold.  Mr. Gunter would not have been terminated had CLI timely approved those absences as FMLA-protected.  Although Mr. Gunter did not completely follow CLI's procedures that governed the reporting of FMLA absences, there is a genuine issue of disputed material fact concerning whether CLI mailed the necessary FMLA paperwork to Mr. Gunter during the month of May 2013.

If CLI had mailed Mr. Gunter the forms, his completion of them would have enabled him to certify to CLI his need for FMLA-protected leave.  If the forms were mailed on that date, it would have allowed CLI to fulfill its duty to "determine whether the leave is being taken for a FMLA–qualifying reason (e.g., after receiving a certification)  . . . [and] notify the employee whether the leave will be designated and will be counted as FMLA leave within five business days absent extenuating

circumstances." See 29 C.F.R. § 825.300(d)(1).  Whether CLI mailed Mr. Gunter the

necessary FMLA paperwork that he had requested from Mr. Letcavage is a pure question

of fact to be decided by a jury.  As the factfinder, the jury alone must assess the

credibility of both Mr. Gunter and Ms. Lacki.  Accordingly, because I find there is a

genuine issue of disputed material fact, summary judgment in favor of CLI on Mr.

Gunter's FMLA interference claim is precluded.

### B.  Mr. Gunter's FMLA Retaliation Claim

FMLA retaliation claims derive from the FMLA's implementing regulations.

Employers may not "discriminate[] or retaliate[] against an employee or prospective

employee for having exercised or attempted to exercise FMLA rights."  See 29 C.F.R. §

825.220(c); see also Erdman v. Nationwide Ins. Co., 582 F.3d 500, 508 (3d Cir. 2009).

To prevail on a claim for FMLA retaliation, a plaintiff must show that he:

> "(1) invoked [his] right to FMLA-qualifying leave, (2)
> [he] suffered an adverse employment decision, and (3)
> the adverse action was causally related to [his] invocation
> of rights . . . . Once [he] establishes a *prima facie* case,
> the burden shifts to the defendant to provide evidence of
> a legitimate, nondiscriminatory reason for the adverse
> action. If the employer meets this 'minimal burden,' the
> employee must then point to some evidence that the
> defendant's reasons for the adverse action are
> pretextual."

Budhun v. Reading Hospital and Med. Ctr., 765 F.3d 245, 256 (3d Cir. 2014) (citations

omitted).  The elements of an FMLA discrimination case are the same.  See Hager v.

Arkansas Dept. of Health, 735 F.3d 1009, 1016 (8th Cir. 2013).  Furthermore, requesting

FMLA leave "does not provide employees with a right against termination for a reason

other than *interference* with rights under the FMLA."  See Lichtenstein, 691 F.3d at 312 (emphasis added).

Although Mr. Gunter satisfies the first two prongs of the *prima facie* case of FMLA retaliation, he provides no evidence showing that his termination was causally related to his attempted exercise of FMLA rights.  Whether CLI properly calculated Mr. Gunter's points under the absentee control policy is a question separate and apart from whether CLI terminated Mr. Gunter because he attempted to invoke the FMLA.  There is no evidence presented that supports a claim that CLI was motivated to terminate Mr. Gunter because he invoked his FMLA rights.  On the contrary, the record shows that Mr. Gunter had some attendance issues, and he was, in some instances, correctly assessed points under the Absentee Control Policy.  There is no causal link, however, between Mr. Gunter's invocation of his FMLA rights and his termination.  Accordingly, I will grant CLI's motion for summary judgment as to Mr. Gunter's FMLA retaliation claim.

An appropriate Order follows.